**Affirmed and Memorandum Opinion filed April 11, 2024.**



In The

# Fourteenth Court of Appeals

### NO. 14-23-00848-CV

## IN THE INTEREST OF J.W., JR., A CHILD,

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2022-01753J**

## MEMORANDUM OPINION

Appellant D.J. ("Mother") appeals an order terminating her parental rights to her son J.W., Jr. ("J.W."). In four issues, Mother argues that (1–3) the evidence is legally and factually insufficient to support the termination of her parental rights under Texas Family Code § 161.001(b)(1) subsections (D), (E), and (O); and (4) the evidence is legally and factually insufficient to support a finding that termination of her parental rights was in J.W.'s best interest. We affirm.

### I.     BACKGROUND

On October 7, 2022, the Texas Department of Family and Protective

Services ("the Department") received a referral concerning Mother and J.W. On October 11, 2022, the Department filed an original petition for conservatorship of J.W. and for termination of the parental rights of Mother and Father pursuant to Family Code § 161.001(b)(1)(D), (E), (K) and (O). Trial took place on September 14, 2023, and the trial court admitted into evidence a police report from October 7, 2022; the removal affidavit; a psychosocial assessment of Mother; drug test results; therapy notes; the family plan for Mother; the permanency report; and Mother's text messages to the Department's caseworker, Danyell Howard ("Howard"). At trial, Howard and one of J.W.'s foster parents testified.

## A.    EVIDENCE AT TRIAL

The evidence at trial showed that law enforcement responded to a call at an apartment complex on October 7, 2022, for a "Welfare Check/Threat Suicide/CIT." When they arrived, they learned from Mother's neighbor that Mother had stolen the neighbor son's ferret, then aggressively knocked on the neighbor's door with a large metal pipe until the neighbor opened the door. Mother told neighbor's seven-year-old son that she should have shot the son and the ferret in the head, and she threw the ferret at the son while he and her neighbor were standing in the doorway. One of the police officers described Mother as delusional, paranoid, and "kept thinking everyone was spying on her." While the police were speaking to Mother outside of her apartment, they smelled "an extremely foul odor" coming from her apartment. She told the police that her child was inside asleep. When Mother partly opened the door, the odor became stronger and police could see feces inside, including on the floor at the doorway.

After detaining Mother and obtaining authority to enter the apartment for a wellness check of the child, the police found four-year-old J.W. sitting on a kitchen counter wearing only a t-shirt and covered head-to-toe in both wet and dry feces.

2

J.W. had feces smeared from his elbows to his hands and his knees to feet, and feces were caked on the bottom of his feet. His t-shirt was so hardened from feces that police had to cut his t-shirt off him to remove it. He had feces in his hair and under his fingernails. The officers saw "a large amount of wet and dry feces" on "numerous surfaces throughout the apartment." There were puddles of urine and fecal matter on a blanket in Mother's bedroom, and feces spread over the walls in almost every room. Although the police had initially suspected that the feces they saw at the apartment's entrance were from an animal, there were no animals in the home.

Moreover, J.W. was "very skinny," there were clothes scattered everywhere, and there was an open jar of mayonnaise and rotted meat on the floor of the apartment. During the police officers' time with him, J.W. did not speak, make any sound, or respond to his name. The police arrested Mother for child endangerment, and an ambulance took J.W. to Texas Children's Hospital.

That day, a Child Protective Services ("CPS") investigator, Adrian Pena ("Pena"), spoke with the officer dispatched to the apartment and visited J.W. at the hospital, then talked with Mother while she was in receiving at the jail to obtain information regarding family or relatives. Pena followed up the next day to gather information regarding the physical neglect and neglectful supervision charge.

### 1. Mother's Mental Health

In the removal affidavit, Pena described that when she spoke to Mother the day after her arrest, Mother stated that her apartment was dirty because she was "feeling like she couldn't do it." Mother also claimed she was potty-training her son and that the apartment had not been cleaned because she was depressed, anxious, and scared. Pena said in the removal affidavit that "there was [sic] concerns that [Mother] was suspected to have unconfirmed severe mental health

3

issues." The removal affidavit further stated that the police officers who encountered Mother believed that she was suffering from mental illness.

Mother's psychosocial assessment was completed in November 2022. In the assessment, Mother related that she had lived in Houston for a year, but previously lived alone in her hometown of Detroit, Michigan. She received housing assistance, SNAP food benefits, and $503 a month in income assistance. In the past, she had worked as a certified nursing assistant in a nursing home, in the fast-food industry, and in retail. However, for the past two years, she had been posting videos of motivational speaking, reading Tarot cards, and discussion of life on her YouTube channel.

The psychosocial assessment notes that Mother describes her son as "like me. Sensitive, quiet, happy." She stated that J.W. spoke only a few words but by the time of the assessment was receiving speech therapy. She felt bonded to her son and said, "I guess I feel like I do want to see him and visit" while he was in foster care. Despite J.W.'s significant lack of speech development and unsanitary living conditions, she rated herself as an excellent and supportive parent, stating, "I try to be as supportive as possible." Although J.W. was very thin and half-clothed in a feces-encrusted shirt upon removal from the apartment, Mother stated in the psychosocial assessment that she made sure her son was fed and clothed and that she played with him. The results of the assessment's Adult-Adolescent Parenting Inventory show that Mother scored within the average range for parenting attitudes in four categories and above-average in a fifth category. In the assessment, Mother stated she is a good mother and that she wished to cooperate, successfully close the Department's case, and regain custody of her son.

Although described in the assessment as cooperative, Mother also expressed delusions of fame, celebrity status, and paranoia that others were trying to "kill her

opportunities" for greater internet celebrity. Mother self-reported in the psychosocial assessment that she had completed a psychiatric evaluation and was diagnosed with "bi-polar disorder possibly or anxiety," but stated "seriously, I don't have a problem."

The psychosocial assessment included recommendations for family reunification, including that Mother participate in intensive individual counseling; continue treatment with a psychiatrist and follow an appropriate medication regimen; obtain stable employment; maintain safe and stable housing; and have regular supervised visitation with J.W.

In a permanency report to the court dated August 25, 2023, Howard stated that Mother had not made progress on recommendations from the psychosocial assessment, including completing or providing a psychiatric assessment, attending individual counseling, providing proof of employment, and providing proof of stable housing. Howard stated in the permanency report that Mother did not complete her individual counseling and was unsuccessfully discharged after failing to attend multiple sessions; and she had refused to attend an evaluation with a psychiatrist at the Department's expense. Mother was reportedly seeing a psychiatrist at Harris Health but did not sign a release of information so that Howard could receive the psychiatrist's notes or recommendations. Mother did provide one summary report from this psychiatrist, which indicated Mother had an unspecified psychosis and had been prescribed Aripiprazole. The permanency report also summarized an assessment with a counselor, Denise Bradley, who diagnosed Mother as persistent with a delusional disorder. Bradley opined that Mother "definitely needs psychotropic medications" and stated Mother was prescribed Abilify for bipolar disorder.

In Howard's testimony, she explained that Mother kept in contact with her,

but the communication was usually one-sided in that Mother "just goes off the board from what I'm asking her." Howard testified that Mother was focused on being a "YouTube influencer" and on herself instead of J.W. Howard also testified that she had concerns that Mother does not have a "firm grasp on reality" and described Mother as delusional. Howard stated that although Mother wanted J.W. returned to her, Mother's failure to address her mental health and instability were barriers preventing J.W.'s return. Howard further testified that Mother had not acknowledged her mental health problems and continued to believe that everyone else is the problem.

## 2. Evidence Relevant to J.W.'s Wellbeing

Howard testified that Mother lived for a time at the Star of Hope homeless shelter and started its New Beginning program but revoked her consent for the Star of Hope case manager to speak to Howard. By July 2023, Mother reported to Howard that she was living in a hotel but failed to provide any information regarding the hotel or location. Further, Mother had not provided proof of employment to Howard, but alleged she was continuing to work as a "YouTuber." She also did not take responsibility for J.W.'s condition when he first entered the Department's care. Finally, Mother did not visit J.W., having last seen him in December 2022.

The evidence shows that after J.W. was removed from Mother's care, J.W. was diagnosed with autism and speech impairment. Before J.W. was placed in foster care, Mother had no concerns about a diagnosis or disability for her son, and she was not seeking help for him. J.W. was 100% nonverbal at the time of removal. After months in foster care and with therapy, J.W. was potty-trained and had progressed to four-word sentences, which he could use without prompts. At trial, Howard elaborated that J.W. could complete sentences and "have a full-

blown conversation back and forth." Unlike when he was removed from Mother's care, J.W. was able "to interact with pretty much anybody that comes in his path." He smiled more, and his aggression had lessened. Howard testified that J.W.'s foster parents had done a good job of socializing him with kids his age and are "amazing with him."

At the time of trial, J.W. was enrolled in Special Education pre-kindergarten. He had received four months of general therapy and two months of life skills therapy. He started occupational therapy in February 2023 and speech therapy and behavioral/social skills therapy in April 2023. Per the permanency report, J.W. needs a "highly structured environment with close supervision to ensure the child's safety." He also requires "a great amount of consistency in disciplinary strategies." Howard testified, consistent with the permanency report, that J.W. needs a greater level of care and a stable home and environment to address his needs. Howard was concerned that Mother, in not taking responsibility for her own mental health, would also not be able to take care of J.W.'s basic needs in addition to his special needs.

J.W.'s foster parent also testified that the foster parents had pursued several avenues to expedite J.W.'s autism diagnosis, which can otherwise take up to two years to diagnose. Having arrived in their home underweight and anemic, the foster parents increased J.W.'s nutrition, and J.W. was no longer anemic. The permanency report concluded that J.W. was eating well in his foster home and also noted that his foster parents travel with J.W., arrange play dates, take him to birthday parties, and take him swimming. Both foster parents have stable employment as a restaurant manager and a teacher. Howard testified that J.W. loves being around both his foster parents, who want to adopt him. Howard also testified that J.W.'s foster parents are very passionate about J.W. and can provide

J.W. the care and stable environment he needs.

## B. Trial Court's Ruling

After trial on September 14, 2023,[1] the trial court found by clear and convincing evidence that termination of Mother's parental rights was proper under Texas Family Code § 161.001(b)(1), subsections (D), (E), and (O) and in J.W.'s best interest. The trial court signed the final decree on October 18, 2023, and this appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

In her first three issues, Mother argues that the evidence is legally and factually insufficient to support the termination of her parental rights under the bases found by the trial court pursuant to subsections (D), (E), and (O). *See* Tex. Fam. Code Ann. § 161.00(b)(1)(D), (E), (O).

## A. APPLICABLE LAW

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see Stantosky v. Kramer*, 455 U.S. 745, 753 (1982). "Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases." *In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring). Accordingly, termination proceedings must be strictly

---

[1] Mother was not present at trial. Her trial counsel noted her absence on the record, saying, "I don't see that she's present," but did not explain her absence. Although the evidence reflects that Mother consistently attended pre-trial hearings, Mother's trial counsel did not file a motion for continuance or object to trial in the absence of Mother. On appeal, there is no assignment of error regarding ineffective assistance of counsel. Father was also not present at trial, but he is not a party to this appeal.

scrutinized. *Id.* at 112. In such cases, due process requires application of the "clear and convincing" standard of proof. *Id.* (citing *Stantosky*, 455 U.S. at 769; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)).

This intermediate standard of proof falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980). "'Clear and convincing evidence' means a 'measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam) (quoting Tex. Fam. Code Ann. § 101.007); *see In re K.M.L.*, 443 S.W.3d at 112–13 ("In cases requiring clear and convincing evidence, even evidence that does more than raise surmise and suspicion will not suffice unless that evidence is capable of producing a firm belief or conviction that the allegation is true.").

The trial court may order the termination of the parent-child relationship if the court finds by clear and convincing evidence that: (1) the parent committed an act or omission described in Family Code § 161.001(b)(1) and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *In re N.G.*, 577 S.W.3d at 232. "To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground." *In re N.G.*, 577 S.W.3d at 232; *see* Tex. Fam. Code Ann. § 161.001(b). However, we must always review a sufficiency challenge to a termination on appeal under subsection (D) and (E). *See In re N.G.*, 577 S.W.3d at 235 ("When a parent has presented the issue on appeal, an appellate court that denies review of a section 161.001(b)(1)(D) or (E) finding deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as

to parental rights to other children.").

## B. STANDARD OF REVIEW

When both legal and factual sufficiency challenges are raised, we must first review the legal sufficiency challenge. *See Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981) (per curiam); *In re S.N.R.T.*, No. 14-23-00358-CV, 2023 WL 7498202, at *3 (Tex. App.—Houston [14th Dist.] Nov. 14, 2023, no pet.) (mem. op.); *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

In a legal sufficiency review, a court views the evidence in a light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, a reviewing court must assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* This does not mean that a court must disregard all evidence that does not support the finding. *Id.* Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. *Id.* at 266–67.

In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence is

10

factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. *Id.*

## C.    TEXAS FAMILY CODE § 161.001(b)(1)(D)-(E)

Subsection (D) allows for termination of parental rights if clear and convincing evidence supports a conclusion that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(D). This inquiry focuses on the child's environment and requires a showing that the environment endangered the child's physical or emotional health. *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). Termination under subsection (D) may be based on a single act or omission. *See In re J.E.M.M.*, 532 S.W.3d 874, 884 (Tex. App.—Houston [14th Dist.] 2017, no pet.). The relevant time frame to determine whether there is clear and convincing evidence of endangerment is before the child was removed. *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022); *In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

Subsection (E) allows for termination if the parent has engaged in conduct which endangers the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(b)(1)(E). Under subsection E, the evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act. *In re S.R.,* 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* Courts may consider conduct both before and

after the Department removed the child from the home. *Id.* The specific danger to a child's well-being may be inferred from parental misconduct standing alone, even if the conduct is not directed at the child and he suffers no actual injury. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Because subsections D and E concern endangerment and the evidence on each may overlap in some respects, we address both predicate findings together. *In re S.R.*, 452 S.W.3d at 359–60.

To "endanger" means to expose the children to loss or injury or to jeopardize their emotional or physical health. *Boyd*, 727 S.W.2d at 533; *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *In re S.R.*, 452 S.W.3d at 360. A child is endangered when the environment creates a potential for danger and the parent is aware of the danger but consciously disregards it. *In re J.E.M.M.*, 532 S.W.3d at 881. "Environment" refers to the acceptability of the children's living conditions as well as a parent's conduct in the home because the parent's conduct in the home can create an environment that endangers the children's physical and emotional well-being. *In re S.R.,* 452 S.W.3d at 360. The acceptability of living conditions and parental conduct in the home are subsumed in the endangerment analysis. *See In re V.A.*, 598 S.W.3d 317, 328 (Tex. App.—Houston [14th Dist.] 2020, pet. denied); *In re J.E.M.M.*, 532 S.W.3d at 880–81; *In re J.D.*, 436 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

### 1. Analysis

### a. Legal Sufficiency

In her brief, Mother argues that there is no evidence the conditions in the apartment in fact endangered J.W., pointing out that Texas Children's Hospital assessed J.W.'s medical condition as healthy. However, "[a]llowing children to live in unsanitary conditions endangers their physical and emotional well-being."

*In re E.C.S.*, No. 14-19-00039-CV, 2019 WL 2589943, at *14 (Tex. App.—Houston [14th Dist.] June 25, 2019, no pet.) (mem. op.) (addressing conditions that included presence of dog feces in home and odor attributable to dog feces and urine); *see In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.) (filthy, squalid living conditions provided legally sufficient evidence of subsection D endangerment). The police report detailed that J.W. was living with Mother in unsanitary, deplorable conditions. Considering the amount of both wet and dry feces present, feces caked on J.W.'s body, clothes, and bottom of his feet that police officers had to scrub off with a towel, the presence of only rotted food, and the "extremely foul odor" that permeated the apartment, it appeared J.W. had been living in those conditions for months. This is legally sufficient evidence of unsanitary conditions to support a finding of child endangerment under (D) or (E). *See In re J.F.C.*, 96 S.W.3d at 266; *In re M.C.*, 917 S.W.2d at 269–70; *In re E.A.D.*, No. 14-22-00025-CV, 2022 WL 2663981, at *5 (Tex. App.—Houston [14th Dist.] July 11, 2022, no pet.) (mem. op.); *In re E.C.S.*, 2019 WL 2589943, at *14.

Mother also argues there is no evidence she had knowledge of the conditions in her home. To the contrary, the evidence shows that Mother was aware of the conditions because she tried to explain the conditions by telling Child Protective Services investigator that she was potty training J.W. and had not cleaned due to her depression and anxiety.

### b. Factual Sufficiency

Review of factual sufficiency "requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *In re A.C.*, 560 S.W.3d at 631. Mental illness alone is not grounds for terminating the parent-child relationship. *In re S.R.*, 452 S.W.3d at 363. "Untreated mental illness can expose a

13

child to endangerment, however, and is a factor the court may consider." *Id.*

Here, while there was evidence that J.W. was "healthy" when evaluated at the hospital, and Mother told Pena she was potty training J.W., there was also evidence that J.W. had feces smeared on his body, in his hair, under his fingernails, and caked on his feet. The apartment had feces on the walls and floors, and urine and fecal matter were found on a blanket in Mother's bedroom. The apartment smelled extremely foul, there was nothing but rotted food to eat, and it appeared the unsanitary conditions had existed for months. Furthermore, J.W. was found underweight and "very skinny," with nothing but rotted food to eat, was 100% non-verbal, and was wearing only a feces-encrusted t-shirt.

The police report states that Mother "showed no concern for her child's safety or well-being" at the time of removal. Mother also told the CPS investigator on the day after J.W. was removed from her care that "she has other things to do than take care of her son"; was "feeling like she couldn't do it"; and that the apartment had not been cleaned because she was depressed, anxious, and scared. This is evidence that Mother's mental health had helped create the conditions in the apartment, contrary to Mother's argument on appeal that there is no evidence in the record that her mental health endangered J.W.

Weighing all the evidence in the record, we conclude that a reasonable fact finder could have formed a firm belief or conviction that Mother (1) knowingly placed or allowed J.W. to remain in conditions or surroundings which endangered his physical or emotional well-being and (2) engaged in conduct which endangered the physical or emotional well-being of J.W. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D)–(E). We therefore conclude the evidence is factually sufficient to support termination under subsections (D) and (E).

14

We overrule Mother's first and second issues.[2]

### III.    BEST INTEREST

#### A.    APPLICABLE LAW

In her fourth issue, Mother argues that there is legally and factually insufficient evidence to support the trial court's finding that termination of her parental rights was in J.W.'s best interest. *See* Tex. Fam. Code Ann. § 161.003(a)(5).

Although prompt and permanent placement in a safe environment is presumed to be in a child's best interest, *id.* § 263.307(a), courts apply a strong presumption that the child's best interest is served by keeping the child with his natural parents. *In re L.C.L.*, 599 S.W.3d 79, 86–87 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (en banc); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The burden is on the Department to rebut that presumption. *In re L.C.L.*, 599 S.W.3d at 87.

In determining the best interest of the child, the factfinder may consider the nine *Holley* factors: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future physical and emotional danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v.*

---

[2] Because only one ground is needed for termination, we need not address Mother's third issue challenging the sufficiency of the evidence for the trial court's finding under subsection (O). *See* Tex. R. App. P. 47.4; *In re N.G.*, 577 S.W.3d at 232.

15

*Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are non-exclusive and the best interest finding does not require proof of any unique set of factors. *See In re J.J.C.*, 302 S.W.3d 436, 447 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). Nor is there a requirement that the Department prove all factors as a condition precedent to the termination of parental rights. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

**B.    ANALYSIS**

As Mother notes, there is scant evidence of J.W.'s desires because he is too young to express them. *See Jordan v. Dossey*, 325 S.W.3d 700, 730 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). There is thus no evidence of his stated desires for the first *Holley* factor. However, Howard testified that in foster care, J.W.'s demeanor changed from standoffish and aggressive to very joyful, with lessened aggression. He loves to be in his foster parents' presence. The foster parents are very nurturing, and the permanency report stated that J.W. had shown "a tremendous amount of growth in his foster home." Moreover, Mother had ceased visitation with J.W. many months before trial. When a child is too young to express his desires, a factfinder may consider evidence that the child is bonded with her foster family, receiving good care in the current placement, and has spent minimal time with a parent. *In re J.D.*, 436 S.W.3d at 118.

With regard to *Holley* factors two through four, the permanency report states that J.W. needs a safe, "highly structured" and routine environment with trauma-focused parenting strategies; close supervision; a great amount of consistency in disciplinary strategies; and early childhood intervention with occupational, speech, and physical therapies. At the time of trial, while living with his foster parents, J.W. was taking speech, occupational, and behavioral therapies and no longer needed life skills and general therapy. He was potty-trained, had overcome his

16

anemia with increased nutrition, and his autism diagnosis had been expedited. One of the foster parents testified that J.W.'s typical day included school, therapy, playtime, and a structured bedtime. On weekends, the foster parents took him on playdates, to birthday parties, and swimming, improving his socialization with children his age. The permanency report states that the foster parents were meeting all J.W.'s needs. Howard also testified that the foster parents were "passionate about meeting his needs."

Although the evidence includes Mother's statements that she fed, clothed, and played with J.W., he was found underweight, with nothing but rotted food to eat, and wearing only a feces-encrusted t-shirt. The psychosocial assessment identified Mother's expressed bond with and commitment to J.W. as strengths, along with her willingness to cooperate with the Department and her average parenting test scores. However, at the time of trial, Mother had not achieved greater stability. Her lack of stable employment raised the concern that she could not financially care for J.W. Her home environment was still in flux, as she had moved from a homeless shelter to a hotel but did not provide Howard with the name or location of the hotel. She did not complete the court-ordered services. She discontinued visiting J.W. in December 2022.

J.W.'s condition at time of removal—anemic, thin, nonverbal, covered in feces—and the apartment's condition indicate a future danger to J.W.'s physical and emotional needs. Evidence of such past misconduct or neglect can be used to measure a parent's future conduct. *In re D.J.G.*, No. 01-22-00870-CV, 2023 WL 3513143, at *19 (Tex. App.—Houston [1st Dist.] May 18, 2023, no pet.) (mem. op.) (citing *In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied)). These conditions also bear on the eighth *Holley* factor— acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate.

*See Holley*, 544 S.W.2d at 371–72.

Germane to *Holley* factors two through four, there was evidence that Mother's mental health remained unimproved overall. When police initially responded to Mother's apartment on October 7, 2022, they were dispatched for a "Welfare Check/Threat Suicide/CIT,". Police then detained Mother for her mental health, intending to seek an emergency detention order "due to her being a danger to others." A police officer who was present described Mother as "delusional" and said she seemed "paranoid, kept thinking everyone was spying on her."

The psychosocial assessment noted Mother's delusions and paranoia and stated that "it is suspected [Mother] has severe mental health issues." During the assessment, Mother had to be "redirected several times to stay on topic" because she wanted to discuss YouTube and her missed opportunity to be a celebrity. In the permanency report, Mother's mental state was described as "persistent." Further, Mother was diagnosed with a delusional disorder and self-reported a diagnosis of possible bipolar disorder or anxiety. The permanency report further noted that Mother "definitely needs psychotropic medications" and continued psychiatric treatment, but Mother refused to participate in the court-ordered psychiatric assessment. Mother instead provided one visit summary from a psychiatrist that showed unspecified psychosis.

In two individual counseling sessions in February 2023, Mother was "extremely paranoid" and expressed beliefs that her family sent people to spy on her. She also said she was afraid to visit J.W. because "I am afraid of trafficking." Focusing instead on being an "influencer," she stated, "I know famous people" and was dismissive of individual counseling: "I don't have time for this." According to session notes summarizing Mother's delusions about social media stardom, "[t]he things she says feels [sic] real to her and is [sic] her reality." Finally, Howard

18

testified that at the time of trial, Mother remained unstable and delusional, failed to acknowledge her mental health problems, conversed in one-sided tangents, and did not complete the court-ordered individual counseling. A parent's failure to appreciate the need for mental health treatment allows a factfinder to infer that such mental health issues will likely recur and further jeopardize a child's well-being in the future. *See In re A.K.T.*, No. 01-18-00647-CV, 2018 WL 6423381, at *13 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, pet. denied) (mem. op).

As to *Holley* factors five through seven, the evidence showed that the foster parents had created plans for J.W. that addressed his physical and emotional needs and were adhering to a schedule enabling "tremendous growth" on J.W.'s part. Both foster parents evinced stability—with employment as a restaurant manager and a teacher—and a clean home with furniture and a bed for J.W. They had "gone above and beyond to make sure" that they were helping to meet J.W.'s needs. They are attentive to socialization, with twice-weekly playdates, playtime, and outings to the zoo, the aquarium, boating, swimming, and birthday parties. In contrast, at the time of J.W.'s removal, Mother had not sought "any kind of accommodations or socialization or help for him." Further, the foster parents have a support system through family in Houston who welcome J.W. In contrast, Mother identified her lack of support as a parenting difficulty. She has very little contact with her family, who live in Michigan, and maternal and paternal grandparents declined the Department's inquiries about placing J.W. with them. J.W.'s biological father, whose parental rights were also terminated, told the Department caseworker that J.W.'s staying with the foster parents was in J.W.'s best interest. Stability and permanence are paramount in the upbringing of children, *In re J.D.*, 436 S.W.3d at 120, and the evidence demonstrated stability for J.W with his foster parents versus instability with Mother.

We conclude that the evidence presented at trial and summarized above is legally and factually sufficient to support the trial court's finding by clear and convincing evidence that termination of the parent-child relationship between Mother and J.W. is in J.W.'s best interest. *See* Tex. Fam. Code Ann. § 106.001(2); *Holley*, 544 S.W.2d at 371–72.

We overrule Mother's fourth issue.

## IV. CONCLUSION

Having determined the evidence is legally and factually sufficient to support termination of the Mother's parental rights, we order the judgment of the trial court affirmed.

/s/ Margaret "Meg" Poissant
Justice

Panel consists of Justices Jewell, Bourliot, and Poissant.